Matter of G.B. (2005 NY Slip Op 50700(U))

[*1]

Matter of G.B.

2005 NY Slip Op 50700(U)

Decided on May 3, 2005

Family Court, Monroe County

O'Connor, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on May 3, 2005

Family Court, Monroe County
In the Matter of the Commitment of Guardianship and Custody of G.B. and S. M., Children under the Age of Eighteen Years, Alleged to be Permanently Neglected by Ms. J., Respondent.
In the Matter of a Custody/Visitation Proceeding under Article 6 of the Family Court Act,
V. G., Petitioner,
 County Department of Human and Health Services, Ms. J. and Mr. M., Respondents. In the Matter of a Custody/Visitation Proceeding under Article 6 of the Family Court Act,
Mrs. B., Petitioner,
 County Department of Human and Health Services, Mr. A. and Ms. J., Respondents. In the Matter of
G.B., A Child Neglected by Ms. J., Respondent. In the Matter of
S. M., A Child Under Eighteen Years of Age Neglected by Ms. J., Respondent.
B1949-04

Lori-Ann Ricci, Esq., Deputy County Attorney, for DHHS.
Thomas A. Rohr, Esq., for petitioner Mrs. G.
Christine Redfield, Esq., Assistant Public Defender, for Respondent Ms. J., mother.
Tynise Y. Edwards, Esq., Assistant Conflict Defender, for Respondent father of S. M., Mr. M.
Steven R. Weisbeck, Esq., Law Guardian.

Marilyn L. O'Connor, J.
In February 2004, the Monroe County Department of Human and Health Services (the Department) filed a petition pursuant to Social Services Law, § 384-b, for termination of respondent Ms. J.' parental rights. The Department alleges that respondent mother had permanently neglected her two children, G.B. (a son, born in1992) and S.M. (a daughter, born in 2002). Respondent mother consented to a finding of permanent neglect. A lengthy hearing regarding disposition was required because the mother wants her two children to be raised by willing relatives, while the Department wants S.M. to be adopted by her foster parents and was looking for therapeutic foster parents for G.B., who is currently institutionalized. The petitions for extensions in the neglect cases involving both children and their mother were carried with the permanent neglect/termination of parental rights case.
At the time of the filing, G.B.'s father, Mr. A., was in prison. Even by the time of this decision, no petition to terminate his parental rights had been filed, so G.B. is not near the point of being freed for adoption. G.B., 12, was and still is residing at the Crestwood Children's Center but wants to reside with his maternal grandmother, Mrs. B.
The parental rights of S.M.'s father, Mr. M., were terminated by this court on May 19, 2004 (B 11465-03). S.M., now 2 ½, has been residing with foster parents, unrelated to her, since a few days after her birth. They wish to adopt her and could apply to do so if she were to be freed for adoption by a disposition in this case terminating her mother's rights and granting guardianship and custody to the Department. However, S.M.'s paternal great-aunt, Mrs. G., filed for custody of S.M. and has had successful visitation with her since May of 2004. This great-aunt also wishes to adopt S.M. if she is freed for adoption.
 In order for a termination petition to be granted the court must find all the elements of the petition have been established. One of those required elements is that "the best interests of the child require that the guardianship and custody of the child be committed to an authorized agency or to a foster parent authorized to originate this proceeding . . . ." (Family Court Act, § 614[1][e], emphasis added). For the reasons set forth below, the court finds that it is the best interests of S.M. to be raised by her great-aunt and in the best interests of G.B. to be raised by his grandmother. Therefore, not all of the elements of the termination petition have been established, and the termination petition will be dismissed as statutorily required when not all the elements are established (Family Court Act, § 632[b]). As discussed further below, when the children's mother stipulated to "permanent neglect" (Social Services Law, § 384-b[7]), she did not stipulate to what disposition is in the children's best interests. Indeed, that has been the issue in dispute. If the children live with their relatives, both children will be able to continue to see their mother, who has visited with them quite regularly. Thus, this disposition presents the profound question of whether two children will be raised by relatives, or will see their mother's parental rights terminated and then be raised by people unrelated by blood-people who may not permit the continued active involvement of the children's mother and other relatives already in their lives. Accordingly, custody of S.M. will be granted to the paternal great-aunt [*2]and custody of G.B. will be granted to his maternal grandmother. There being no need to extend the neglect order for S.M., that case will be terminated. However, as G.B., his mother and his grandmother continue to need services, an order extending the neglect case regarding G.B. will be granted but placement will be modified to be with Mrs. B. as grandmother. Further, the custody order regarding G.B. will be made subject to the neglect proceedings, and to the rights of G.B.'s incarcerated father.
PROCEDURAL HISTORY Both children came into the care and custody of the petitioner by emergency removals at different times and different ages. When G.B. was almost 9 years old he was removed on October 3, 2001, from the home of his grandmother and mother. Prior to his removal he had lived since birth with his maternal grandmother and grandfather (now deceased), and his mother. At the time of this hearing, he was residing at Crestwood Children's Center, and a therapeutic foster care home (preferably "pre-adoptive" according to the Department) was being sought for him. This was despite the facts that he unquestionably and consistently expresses his desire to live with his maternal grandmother, who wants him, and that his mother continues to visit him quite regularly and could see him every day at her mother's/his grandmother's home. On February 7, 2005, while this termination matter was being tried, G.B.'s maternal grandmother filed a custody petition for G.B.
 In contrast, S.M., born November 24, 2002, was promptly removed November 26, 2002. She never lived with her mother, father or other relatives. S.M. was placed with foster parents unrelated to her, i.e., Mr. and Mrs. Doe. They wish to adopt her. At the time of the filing of the termination petition in February of 2004 she had lived with the Doe family for 13 months-i.e., only one month more than the one year necessary to make out a prima facie case of permanent neglect. While it was pending, her mother had continued to visit with her. On May 11, 2004, only a few days before S.M.'s father's parental rights were terminated and promptly upon learning of S.M.'s existence, S.M.'s paternal great-aunt, Mrs. G., filed her pending custody petition for S.M. S.M. was at that time only about 1 ½ years old. S.M.'s mother continues to see S.M., as do other relatives.
 On June 30, 2004 respondent consented to a permanent neglect finding regarding both children. Due to her consent, there is no need to determine the merits of the claims against the respondent mother, except to the extent that these facts relate to disposition. The disposition options are dismissal of the termination petition, a suspended judgment, and committing the guardianship and custody of the children to petitioner on such conditions, if any, as the court deems proper. A hearing was required for disposition. After the testimony over the course of eight days,[FN1] decision was reserved. Temporary orders extending the related neglect petitions had been granted in due course and are still in effect.
PARTIES' POSITIONS
The respondent mother wants her daughter S.M., now age 2 ½, to live with the child's [*3]paternal great-aunt and argues that is in her best interests. Similarly, she wants her son G.B., age 12, to live with his maternal grandmother and argues that it is in his best interests. This would allow her to maintain relationships with both children and could make termination of her rights to themand theirs to herunnecessary and inappropriate. The respondent mother lives with an uncle across the street from her mother/the children's grandmother and would be able to see G.B. regularly, just as she now sees her other daughter, Tina, who also lives with the grandmother. Respondent mother would also be able to visit S.M. regularly as the great-aunt is willing to adopt S.M. and to continue to keep her connected with her mother, siblings and other family members, as she has done since her visitation began in May 2004.
The Department' s position regarding S.M. is that there is no basis for dismissal or suspended judgment. It believes permanency must be established for this two-year-old and that S.M.'s best interests would be served by granting guardianship and custody to the Department, rather than to have custody granted to her great-aunt. This would free her for adoption by the non-relative resource foster parents. It is not disputed that if S.M. were adopted by her current foster parents it is very likely that contact with her mother would be minimal, if not ended altogether. Contact with her other relatives, including siblings, would also presumably be minimal or non-existent.
The Department's position regarding G.B. is that there is no basis for dismissal, that a suspended judgment is not warranted, and that the court must commit the guardianship and custody of the adolescent to the Department. It is the Department's stated intention that he should be placed in a non-relative resource therapeutic foster home and freed for adoption. (This will require termination proceedings against the father to be filed and successfully prosecuted, as currently there is a support order against him but no neglect or termination proceeding has even been started.) The Department opposes placing G.B. with his grandmother since the relevant Department employees believe G.B. has special needs and six children may be difficult for the grandmother to handle. She already has custody of G.B.'s sister Tina (age 9) and four of their cousins (three boys, ages 13, 12, 9, and a girl, age 5). The Department is not even willing to let the grandmother try to handle all six in order to see if G.B.'s problems might dissipate upon being allowed to live with his grandmother.
The law guardian wants S.M., who is too young to express an opinion, to stay with her foster parents and be adopted by them. In contrast to his recommendation for S.M., however, the law guardian wants G.B. to live with his grandmother, pursuant to the adolescent's consistently expressed desire to resume living with his grandmother who helped raise him and with whom he has a mother-son relationship.
THE COURT'S OPTIONS There is a dispute as to the details of the court's lawful options for disposition in a termination proceeding. However, it is agreed that the court may dismiss the petition, grant a suspended judgment or commit guardianship and custody to the Department (Family Court Act § 631). Specifically, a key issue which arose during the extended hearing was whether the court has authority to order upon a disposition (other than dismissal) that a child be placed with a particular person, such as the great-aunt or the grandmother, if it finds that such placement would be in the child's best interests. Presumably because of the respondent's consent to a permanent neglect finding, the possibility of a dismissal was not seriously advanced by any party, though the [*4]County expressly argued dismissal would be inappropriate. Careful analysis, however, reveals that what is in the children's best interests is the key to the disposition here, and if it is not in the children's best interests to be placed in the custody and guardianship of the Department, dismissal of the termination petition is actually required.
The Department argues that the great-aunt and grandmother must establish that extraordinary circumstances exist in order for the court to consider best interests. This is not true. The Department's reliance on Bennett v Jeffreys (40 NY2d 543) is misplaced. Extraordinary circumstances need to be established by a non-parent seeking to obtain custody in place of a biological parent-not when a relative seeks custody of a child then in the care and custody of the Department. As explained in Bennett v Jeffreys (40 NY2d 543, 547-548), the best interests of a child are critical once a parent is found unable to raise a child:
. . . in Matter of Spence-Chapin Adoption Serv. v Polk (29 NY2d 196, 204), the court rejected any notion of absolute parental rights. The court restated the abiding principle that the child's rights and interests are "paramount" and are not subordinated to the right of parental custody, as important as that right is (p 204). Indeed, and this is key, the rights of the parent and the child are ordinarily compatible, for "the generally accepted view [is] that a child's best interest is that it be raised by its parent unless the parent is disqualified by gross misconduct" (p 204). Recently enacted statute law, applicable to related areas of child custody such as adoption and permanent neglect proceedings, has explicitly required the courts to base custody decisions solely upon the best interest of the child (Social Services Law, § 383, subd 5; Domestic Relations Law, § 115-b, subd 3, par [d], cl [v]; Family Ct Act, § 614, subd 1, par [e]; § 631; see Matter of Anonymous [St. Christopher's Home], 40 NY2d 96, supra; Matter of Orlando F., 40 NY2d 103, supra; Matter of Ray A. M., 37 NY2d 619, 621, supra; cf. Lo Presti v Lo Presti, 40 NY2d 522). Under these statutes, there is no presumption that the best interest of the child will be promoted by any particular custodial disposition.
(Emphasis added.)
Of course, when natural parents are in a custody dispute with each other, best interests of the child is also determinative (e.g, Paul C. v. Tracy C., 209 AD2d 955).
Furthermore, the Fourth Department's ruling in Matter of Karen A.O. (6 AD3d 1100, 1101) dictates that the custody claims of family members filed during termination proceedings are not to be dismissed but are to be considered in the permanent neglect (i.e., termination) proceeding's disposition phase, "where the court will determine the best interests of the children". (Emphasis added.) Thus, this court previously ruled that the custody claims of the great-aunt and grandmother must be determined as part of the termination of parental rights disposition.
Finally, section 631 of the Family Court Act itself, entitled "Disposition on adjudication of permanent neglect", makes "best interests" the sole basis for a decision:
At the conclusion of a dispositional hearing on a petition for the commitment of the guardianship and custody of a child, the court shall enter an order of disposition:(a) dismissing the petition in accord with section six hundred thirty-two; or(b) suspending judgment in accord with section six hundred thirty-three; or(c) committing the guardianship and custody of the child in accord with section six hundred thirty-four.An order of disposition shall be made, pursuant to this section, solely on the basis of the best interests of the child, and there shall be no presumption that such interests will be promoted by any particular disposition. (Emphasis added.)
 Very importantly, the respondent mother did not concede that all allegations of the [*5]termination petition were established. She agreed instead that "permanent neglect" was established. An analysis of the definition of permanent neglect set forth in Social Services Law, § 384-b, and of the requirements of a termination petition as provided by Family Court Act, § 614, shows that the petition must allege more than just the definition of "permanent neglect" which has been conceded. Section 614 says termination petitions must allege as one of their five elements that "best interests" require that guardianship and custody of the child be committed to an authorized agency (or a foster parent authorized to originate this proceeding-an aspect not applicable here). Further, section 632(a) of the Family Court Act directs that, "If the allegations of a petition under this part are not established, the court shall dismiss the petition." (Emphasis added.) Since this court finds that the best interests of the mother's two children would not be served by an order granting guardianship and custody of the children to the Department, as set forth below in detail with respect to both children individually, the termination of parental rights petitions must be dismissed even though permanent neglect was admitted.
THE EVIDENCE AND FINDINGS
 The disposition hearing witnesses were Mrs. G., S.M.'s great-aunt; Mr. G., the great-aunt's husband; the great-aunt's mother; the great-aunt's daughters; Lorraine Kidd, the Berkshire Farms Center and Services for Youth caseworker on S.M.'s case; Linda Cadogan, a Department caseworker on S.M.'s case; Mrs.Doe, S.M.'s foster mother; Mr. Doe, S.M.'s foster father; Martin Kaufman, Ph.D., the Department's expert witness/psychologist for S.M. specifically; Rebecca Ippolito, G.B.'s therapist at Crestwood Children Center; Katrina Best, Department caseworker for G.B.'s case; and Mrs. B., G.B.'s maternal grandmother. 
S.M.'s Best Interests:
 Legally this is a battle for custody between the petitioning blood relative and the Department, which currently has guardianship and custody of S.M. under a neglect case, and has placed her with foster parents pursuant to a contract which requires them to give her up if so directed. However, this case presents, in effect, a battle for custody of a toddler pitting an extraordinarily fit and competent non-parent blood relative against foster parents who have apparently done a good job of raising the little girl at issue with the help of regular day care provided by their own relatives. This unfortunate situation could have been avoided if the Department had located the great-aunt, as a relative resource, much earlier in the toddler's life.[FN2]
The evidence regarding S.M.'s best interests revealed numerous blood relatives who are actively involved in S.M.'s life. Those relatives included one who tried to get custody of S.M. before she was one year old, and two more who contacted the Department about having S.M. live with them. Importantly, the evidence showed that S.M.'s mother, unlike many mothers with children in foster care, has had consistent, happy, weekly visitation with S.M. throughout all but a few months since she was born.[FN3] She wishes to continue seeing her child even though she [*6]concedes she is not currently capable of raising her by herself. Thus, S.M.'s mother strongly supported the paternal great-aunt's custody petition.
The testimony convincingly established that on May 11, 2004, only days after learning of S.M.'s existence, Mrs. G., as S.M.'s biological paternal great-aunt, filed a petition under Article 6 of the Family Court Act seeking custody of S.M. While much effort was devoted during the hearing to trying to prove that the great-aunt must somehow have known of S.M.'s birth to her nephew and his former girlfriend long before she filed her petition, there was no evidence of this. The open and obvious nature of a late-term pregnancy makes it easier for relatives of an unmarried mother-to-be to learn of the pending birth than relatives of an unwed father-to-be, who may not even know himself that he is about to be a biological father. The evidence demonstrated that the father's side of the family slowly learned of S.M.'s birth, through random communications of bits of information. The evidence also established that the child's father had been "in and out of jail" and "in and out of town" after S.M.'s birth and was not close to his aunt. The evidence further established that S.M.'s father's mother, i.e., a half-sister of Mrs. G., lived in Georgia at all relevant times and was not close to Mrs. G. either. There was no evidence that this woman advised the great-aunt of the child's birth, and indeed it appears likely that shethe father's motherhad no concrete knowledge about the birth for quite some time.
The evidence establishes that petitioner eventually learned of S.M. from S.M.'s father's brother. The witnesses repeatedly corroborated the great-aunt's testimony that upon learning of the child's existence, she promptly filed for custody and took immediate steps to establish a relationship with the child, the child's mother and the foster mother. The great-aunt's testimony in this regard is credible in part because it is so consistent with other evidence reflecting on her good character and commitment to this child and to family generally. S.M.'s great-aunt has had visitation since May 2004. Upon learning of the child, she was told that S.M. and her mother were at a certain Burger King at that very moment. The great-aunt immediately went to that Burger King, introduced herself, and began the personal relationship which she now wishes to turn into a formal custody arrangement. In the great-aunt's custody, S.M. will grow up knowing her half-siblings (her mother's children G.B. and Tina and her father's child, Zoey), her mother, her father if he so chooses, cousins, and other relatives. These other relatives include her maternal grandmother (Mrs. B.), her paternal grandmother, and a cousin of her father, all of whom had at one time contacted the Department about obtaining custody of S.M.
It is undisputed that S.M. is a happy, well-adjusted child. It appears that the foster parents have generally done a good job caring for her (and their three biological children). Both Mr. and Mrs. Doe normally work outside the home, with Mrs. Doe's usual work day starting at 7 AM. Thus, S.M. has routinely gotten up early on week days. Mrs. Doe has fixed her hair, and Mr. Doe has dressed her. Mr. Doe would thereafter take her to a daycare run by relatives of Mr. and Mrs. Doe. S.M. has routinely spent 9 hours each work day in day care, and this would account for at least some of the child's very sociable nature.
The court found troubling evidence, however. The foster mother confirmed that she had told the great-aunt that if the great-aunt were awarded custody, they, Mr. and Mrs. Doe, would not want visitation, which was offered by Mrs. G. The foster mother testified that this was "because I felt it would be too traumatizing for S.M. to see us as visitors when she sees us as her parents at this point". Mrs. Doe testified they would "probably" want phone calls or pictures. [*7]She confirmed that unfortunate decision was still her position at the time of the trial.
It is standard practice to have a transition period when a child is moved from one home which was expected to be permanent to another. Such transitions are designed and conducted to meet the needs of the child. Adults involved, regardless of their personal feelings, should be flexible. Going "cold turkey" may or may not work for a given child and how it will work cannot be known in advance. Thus, it would have been far more appropriate if the foster mother had thought of the child's needs first-whatever they may prove to berather than her own apparent disappointment, rationalized in terms of what she says she believes would be hard for S.M.
The evidence shows the petitioning great-aunt would have been a very appropriate relative resource in the underlying neglect case, and that she is an excellent potential custodian. She was 52 at the time of the hearing, a former foster care mother herself,[FN4] retired from Kodak, and married to a man who works short, relatively flexible hours managing real estate which he owns. He strongly supports the custody petition. The family income is around $75,000 per year. The great-aunt is free all day to be home with S.M., and she intends to be home with her if she obtains custody. Thus, Shy-Asia would not be in day care.[FN5] The great-aunt and her husband live in their own 3-bedroom home in a quiet neighborhood, where most people own their own homes. S.M. would have her own room. (She currently shares a room at the Doe home.) S.M. would go to the Gates public schools and to church if she were to live with her great-aunt. The great-aunt and her husband have no child protective history or other negative background to undermine their qualifications to raise S.M. They have demonstrated admirable character by coming forward to take on a lifetime commitment to this little girl.
S.M.'s great-aunt's own family is substantial evidence of her parenting abilities. She has two grown children, both successful, caring daughters, who testified at the hearing. Like their mother, both are involved in social work. One is a college-educated Child Protective Services worker. The other is a certified nursing assistant, who at the time of the hearing was going to school in social work. This daughter has already taken into her care a 3-year-old relative who plays with S.M. during many visitations with the petitioner. Indeed, S.M. often sees her own paternal half-sister Zoey, age 6, at the great-aunt's home, and this happy relationship would be enhanced by custody with the great-aunt. Unquestionably the great-aunt would encourage and actively facilitate S.M.'s interactions with numerous blood relatives in a healthy, normal extended family fashion. Indeed, she has already done so through her visitation schedule. Probably most importantly for S.M.'s development is the fact that S.M. would continue to see her own biological mother, with whom she unquestionably has a significant on-going relationship. She would also have the possibility of seeing and knowing her father.
The evidence showed that S.M. has a warm, healthy relationship with her petitioning great-aunt. It began with the first minimal visitation awarded on May 19, 2004 when the little girl was only 18 months old. After the great-aunt's background and qualifications were [*8]investigated, visitation was increased to two hours every Sunday, plus from Saturday at noon to Sunday at 3 PM on alternate weekends. Thus, at the time of the hearing, petitioner was seeing S.M. consistently every week.
The facts here pose the critical questionis it in a well-adjusted toddler's best interests to stay with the foster parents who have raised her since birth, or to go live with a blood relative who has sought custody since learning of her, has a warm and loving relationship with her, and will keep her connected with her extensive biological family? In determining the child's best interests, the court is to be guided by a "considered social judgment in this society respecting the family and parenthood"-not just parenthood (Bennett v Jeffreys, 40 NY2d 543, 549, supra, emphasis added).
 The intent of the Legislature is relevant here. The nature of foster care in New York has been aptly defined as "[a] child welfare service which provides substitute family care for a planned period for a child when his own family cannot care for him for a temporary or extended period, and when adoption is neither desirable nor possible." (Smith v Organization of Foster Families, 431 US 816, 823, supra, emphasis added.) Of course, when S.M. was placed in foster care as a newborn, adoption was not possible because she had two parents whose parental rights had not been terminated.
"No one would seriously dispute that a deeply loving and interdependent relationship with an adult and a child in his or her care may exist even in the absence of blood relationship." (Smith v Organization of Foster Families, 431 U.S. 816, 844). However, it has been held that such relationships, no matter how good, are not controlling when a natural parent wrongly deprived of custody seeks the return of a natural child from a pre-adoptive home (E.g., In re Petition of Doe, 159 Ill2d 347, cert den 513 US 994 and 515 US 1152; In re Clausen, 442 Mich 648). In the context of foster care, the United States Supreme Court in Smith (supra, p 845) also explained that while a foster family "has its source in state law and contractual arrangements", a natural family "has its source, and its contours are ordinarily to be sought, not in state law, but in intrinsic human rights, as they have been understood in 'this Nation's history and tradition.'" (Emphasis added.) The case at bar, of course, pits a foster family against an extended natural family member rather than directly against a biological parent. The question then becomes, does a similar principle of intrinsic human rights apply to blood relatives seeking custody? This court answers affirmatively.
 The unique importance of extended family members as a means to get children out of the foster care system is aptly clarified by the Court of Appeals in Matter of Michael B. (80 NY2d 299, 316), which says in its most relevant part:
Paragraph (b) [of Social Services Law 392(6)], by contrast, contemplates removal of the child from the foster care system by return to "the parent, guardian or relative, or direct[ion] that the child be placed in the custody of a relative or other suitable person or persons." The 1989 statutory revision added as a permissible disposition the placement of children with relatives or other suitable persons. The purpose of this amendment was to promote family stability by allowing placement with relatives, extended family members or persons like them, as an alternative to foster care (see, Sponsor's Mem in Support of Amended Bill, L 1989, ch 744, and 10 Day Bill Budget Report, A 7216-A, Governor's Bill Jacket; see also, Matter of Peter L., 59 NY2d [513], at 519, supra). (Emphasis added.)
The statutory amendment quoted above establishes conclusively the public policy that getting children out of foster care and into the homes of extended family members is an [*9]important goal of the state Legislature. It is also common sense that when a parent cannot care for a child, a suitable relative is a preferable alternative to foster care with biological strangers. Furthermore, Matter of Michael B. explains that foster parents have limited rights and may not even be awarded legal custody of a child. Custody is with the Department. The Court of Appeals explained (Matter of Michael B, supra, 309-310),
Because of the statutory emphasis on the biological family as best serving a child's long-range needs, the legal rights of foster parents are necessarily limited (see, Smith v Organization of Foster Families, 431 US 816, 846). Legal custody of a child in foster care remains with the agency that places the child, not with the foster parents (Social Services Law § 383 [2]). Foster parents enter into this arrangement with the express understanding that the placement is temporary, and that the agency retains the right to remove the child upon notice at any time (People ex rel. Ninesling v Nassau County Dept. of Social Servs., 46 NY2d 382, 387, rearg denied 46 NY2d 836). As made clear in Matter of Spence-Chapin Adoption Serv. v Polk (29 NY2d 196), "foster care custodians must deliver on demand not 16 out of 17 times, but every time, or the usefulness of foster care assignments is destroyed. To the ordinary fears in placing a child in foster care should not be added the concern that the better the foster care custodians the greater the risk that they will assert, out of love and affection grown too deep, an inchoate right to adopt." (Id., at 205.)Foster parents, moreover, have an affirmative obligationsimilar to the obligation of the Stateto attempt to solidify the relationship between biological parent and child. While foster parents may be heard on custody issues (see, Social Services Law § 383 [3]), they have no standing to seek permanent custody absent termination of parental rights (see, Matter of Rivers v Womack, 178 AD2d 532) (Emphasis added.)
The Family Court Act (§1055[b][vii][B][3]) provides "that it is the legal responsibility of the commissioner of social service to unite and reconcile families whenever possible. . . ." Family Court Act (§ 1017) also requires an immediate investigation to locate relatives of a child when a court determines that a child must be removed from his or her home, as was the case here.[FN6] The evidence shows the Department did not do the required investigation to locate relatives that existed, immediately or otherwise. Under the law and the facts, there is no question but that the great-aunt should have been located and if asked would have taken custody of S.M. when she was a newborn. Time was of the essence in S.M.'s life-yet the Department made no real effort to find any relatives. Instead, it acted as if its work were over once S.M. had been placed and joyfully received (as demonstrated by numerous photographs)[FN7] in a foster home that was clearly pre-adoptive.
The Department now argues that great-aunt should have worked harder to find a baby she did not even know existed, and that the court can overlook the Department's failure to find the baby's relatives. But the Family Court Act (§§ 1017l 1055[b][vii][B][3]) requires the Department to locate relatives, not the reverse. The Department knew who S.M.'s father was and how to contact him. Nonetheless, the evidence established that neither the Department nor [*10]any agency on its behalf did a family tree for S.M. The testimony indicated clearly that the father was simply not asked questions to enable the Department to find his many relatives. This task of talking to the father was left to a Berkshire Farms worker, though Berkshire Farms did not have the statutory obligation to do an investigation for relatives. The Berkshire caseworker testified that she had two contacts with the father, and it was clear she never carefully quizzed him about his relatives and possible relative resources. The child's maternal grandmother, Mrs. B., now seeking custody of G.B., age 12, was mentioned as a resource-but then ignored based on the other older grandchildren living with her. The Department's efforts to prove that it at least sent one or more letters seeking relatives fell short. This was a serious failure by the Department, and may indeed be a systemic failure.
When asked why she was a foster parent, Mrs. Doe testified, "We know there are a lot of children out there that have a need of a good home" (emphasis added). The court takes judicial notice of the common knowledge that many children need good foster homes. However, S.M., it turns out, is not one of them. She has available to her a good relative resource home, as good if not better than the Doe home. S.M.'s future with the Doe family is promising, but her future with Mrs. G's family is even brighter and closer to a "normal" nuclear family. This is not to say that a petitioning relative automatically prevails over the foster family chosen by the Department to adopt a child if freed (cf. Violetta K v Mary K., 306 AD2d 480), but that the biological ties are a priceless factor affecting best interests which may at times weigh heavily in favor of the relative. (See People ex rel. Sibley v Sheppard, 54 NY2d 320.) [FN8] At other times, blood ties may not carry enough weight to allow a relative to prevail on a "best interests basis" when all the facts are considered. However, a timely argument that a blood relative has a fundamental, due process, constitutionally protected liberty interest in a child might allow a relative to prevail where the standard best interests test would not. (See, e.g., Matter of Peter L, 59 NY2d 513, supra, where this potentially persuasive constitutional issue was mentioned but not reached as it was not timely raised. The Court of Appeals implied that although the grandmother lost a custody battle for her grandson on "best interests" grounds, she might have won had she claimed a constitutional right to custody.)
Even the expert witness, called by the Department, was not persuasive in his testimony opposing custody to the petitioner. He was ambivalent when he testified that S.M. might suffer trauma if she does not stay with the foster parents, but he also admitted she might not. It appears likely even from his testimony that S.M. is a well adjusted child with a good attachment history who will prosper and blossom in the care of her extraordinarily fit great-aunt and in the context of her extended family. The custody petition has been fully litigated, and with the dismissal of the termination petition as to S.M., custody will be granted to S.M.'s great-aunt.
The transition from the foster family to the petitioner's family should take place forthwith, and it is hoped that Mr. and Mrs. Doe will participate thoughtfully in a transition process conducted for the benefit of this little girl. If the Department intends to file an appeal, this court will issue a stay pending appeal. The stay will provide that S.M. will continue to reside with the foster parents, but shall spend work day hours with the great-aunt, rather than in day care. Thus, the foster parents will be required to take S.M. to the great-aunt's home when they would [*11]otherwise have her in day care, and to pick her up from the great-aunt's home as well. Additionally, S.M. shall continue to spend alternate weekends from noon on Saturdays to 3 PM on Sundays with the great-aunt, as well as two hours on the other Sundays. Such an arrangement is expected to be in the best interests of S.M. and should not prejudice either the foster parents or the great-aunt.
G.B.'s best interests:
Legally G.B.'s future presents a battle between the Department which believes that G.B.'s grandmother cannot handle one more child, and that grandmother who is willing to try. For many of the reasons set forth above with respect to S.M., and for the additional reasons discussed below, the grandmother will have G.B. placed in her care and custody. She is not even competing with any particular foster family that has an established relationship with G.B. She should be allowed to raise G.B., along with her other grandchildren, and the Department should continue to provide support for G.B. by arranging for him to continue to attend school at Crestwood during the day and have all the reasonable services he needs.
Testimony showed that an effective family unit which can now be partially restored had existed with G.B., his grandmother, grandfather and mother. The evidence established that this family began to disintegrate when G.B.'s grandfather died in 1999. The subsequent lack of the grandfather's financial support contributed to inadequate housing which led to the removal of G.B. and Tina in 2001.[FN9] The grandfather was central in this family and was a loving male role model. His death was devastating, especially for G.B., with whom he often went fishing, traveled, and did other fun activities. G.B. remembers well the love of his grandparents and intends to return to his grandmother when he is able. His mother also testified that her mother and G.B. have "always been good together . . . he loves her to death. He asks about her all the times [sic]. . . ." There was considerable positive testimony about the grandmother, plus the Department clearly approves of her as a relative resource generally since it so recently placed Tina with her. G.B.'s placement with family may prove more helpful than all the therapeutic foster care the system could muster.
The evidence overwhelmingly established that this troubled 12-year-old wants to live with his family rather than with therapeutic foster care providers who presently have not been identified and when found would be strangers. At his grandmother's G.B. will be with family, including two boy cousins, ages 13 and 12, as well as his little sister and his grandmother, who was arguably his most important caretaker for nine years from his birth. There is no good reason not to grant what the boy, his mother and his grandmother all want. The Department's opposition has no rational basis.
G.B.'s therapist at Crestwood Children's Center, Rebecca Ippolito, described his problems as follows:
G.B. is - has an anger management problem. He can be very aggressive. Outbursts at times. He has a tendency to shut down about his emotions if he becomes upset. If he is feeling bad or depressed he shuts down and refuses to talk.
. . . .He's been identified as developmentally delayed.
. . . He's progressed very far. He came from not being able to talk about anything and having [*12]very aggressive outbursts where he would throw chairs, attack the teacher and be in safety holds about half an hour every couple months or two times a month to he hasn't had one safety hold in the past six months. He's able to talk about his feelings with certain staff that he feels comfortable with. He gets along well with peers. He knows the structure of the program.
. . . . G.B. is ready for discharge. The main thing is that he is so uncertain of his future. That makes him pretty anxious. And we really don't know where we would be placing him, but he is doing very well.
She noted G.B. started improving in the spring of 2004 and has made a lot of gains academically. The therapist testified to speaking with G.B.'s grandmother at several visitations and said she had no objection to the boy going with the grandmother. The Department caseworker specifically testified that G.B. sometimes gets angry at not being with family. G.B.'s mother testified that he gets along well with all the children who live with her and is particularly close to one of them, a boy about his age.
The Department caseworker also testified that a decision as to the level of placement G.B. needed was made by her and her supervisor. Nonetheless, she was not able to answer the question, "What special needs does G.B. have that only a therapeutic foster home can address given the extensive after care programs that Crestwood has in mind for him?" She admitted that she "guessed" it would be helpful to G.B. to be with family rather than total strangers.
Significantly, the grandmother testified that she is aware of his current problems but that she has not had such problems with him in the past. Furthermore, the evidence shows he is comfortable with her and wants to be with her. His therapist testified she had seen G.B. with his grandmother, and that he is very close to her and affectionate with her, and she is affectionate with him. It is logical to believe that he would be able to talk with her about his problems just as he talks to Berkshire staff people with whom he is comfortable, and that this would be helpful for him. The evidence established he was being treated for depression and was anxious. It also consistently showed he felt bad about not being with his grandmother and the other children. Logically, this feeling of deprivation would contribute to his depression and anxiety. If told he could go live with his grandmother, his depression and anxiety might well be reduced. His law guardian argued that when G.B.'s success depends so much on his willingness to move forward with treatment, and since there has been no showing that he would be unsafe with his grandmother to whom he is bonded, then being in a place where he does not want to be would not be in his best interests. He asked that G.B. be discharged to his grandmother. The court will grant that request. (Cf. People ex rel. Sibley v Sheppard, 54 NY2d 320, supra.)
The grandmother is coping so well on her own with four children that she recently took in Tina, G.B.'s sister, with the Department's cooperation and consent. The Department caseworker checked on the status of the children and found their grades and school attendance were acceptable, and they had no significant known medical problems. The caseworker did not know of any behavioral issues. G.B.'s mother lives across the street with her uncle (and had done so for 1 ½ years). She testified she goes to the home of her mother, Mrs. B., every day and helps cook and gets her daughter Tina ready for school. The mother testified she gets her daughter off [*13]the bus and helps her with her homework.[FN10] She could similarly help raise G.B.
As with S.M., the testimony also showed the department did far too little to explore relative placements which could eliminate the potential for termination of the mother's parental rights regarding G.B. When the mother indicated she wanted G.B. to live with the grandmother, the Department did nothing to pursue this ideaeven though it had recently placed G.B.'s sibling there and had been so unconcerned about the grandmother's abilities that it looked in on her progress only once in seven months. That Ms. B. and the respondent may not have asked hard enough or "officially" is no excuse for the Department not doing its job. Indeed, Ms. B. testified she felt as if the Department was discouraging her from even visiting G.B. A Department assumption that the grandmother could not handle her grandson was not a legally sufficient response to a reasonable placement suggestion with great potential to be helpful to G.B.'s well-being. There simply is no value to terminating the extensive family relationships of a troubled adolescent boy for whom adoptive parents do not currently exist and might never be found-especially when the grandmother he obviously loves wants to raise him. (Cf. Matter of Michael E., 241 AD2d 635; Matter of Christopher T., 101 AD2d 997.)
While the two-year-old S.M. would probably forget her mother if visits stopped soon, the 12-year-old boy would never forget her-or his grandmother. Terminating the mother's rights to see G.B. would also terminate his rights to see his mother, and for all practical purposes would cut off his relationship with his maternal grandmother. This would prove to be extraordinarily cruel and not in his best interests. Indeed, it is hard to imagine how such a termination would feel like anything but irrational, undeserved punishment from G.B.'s point of view, since he is determined to go live with his grandmother when he is 18 if not allowed to do so before. G.B. deserves a chance to go home now.
 The Court hopes that the Department will make a serious effort to find such financial and other support as it can to help G.B.'s grandmother and to provide continuing services to G.B. in order to give this placement the best chance possible of success. While the termination petition is dismissed, custody of G.B. will be granted to his grandmother reserving to the father his rights because he was not timely served with the grandmother's custody petition.[FN11] The Department and Ms. J., as parties in the termination case, participated fully in these disposition proceedings. All their rights in the custody proceeding were protected and litigated even though they were not served with the custody petition regarding G.B. before the termination disposition hearing ended. They were served and appeared in the custody case before the issuance of this decision and order, and neither objected to custody of G.B. being resolved in the termination disposition.
NEGLECT EXTENSIONS
As indicated above, the neglect extension petitions have been carried with the termination case. Routine extensions were granted pending the decision in the termination matter, and the [*14]extension petitions themselves require determinations. S.M., upon being transferred to her great-aunt's custody, will need no further services. Accordingly, the neglect order with regard to her shall be terminated effective upon the transfer.
G.B., however, will continue to need services, his mother will continue to need rehabilitative and support services, and his grandmother may need support from the Department. Thus, the court finds it is in G.B.'s best interests to extend the current neglect order for one year from the date of this decision. The Department shall submit a separate order of extension and permanency, substantially similar to the prior orders in the neglect case, with the findings and goal as set forth herein. Placement shall be modified to place him with his grandmother, Mrs. B., a fit and willing relative, and his sibling Tina, again in his best interests. Mrs. B. shall be offered the opportunity to become a certified foster care parent and advised as to what that would mean for her and the children in her care under the supervision of the Department. The mandatory "contrary to the best interests" finding shall state that G.B.'s return to his mother's home at this time would be contrary to his welfare because the respondent mother by her own admission is not prepared to care for G.B. independent of her mother, and that the testimony supports the finding that his best interests require placement with his grandmother. The court will approve a goal of placement, i.e., custody with, or adoption by, a responsible relative.
Significantly, there will also be a finding that the Department did not make reasonable efforts to return G.B. to the care and custody of his mother. This finding will be based upon the termination disposition hearing as well. The testimony repeatedly showed little was done to support the respondent mother in her efforts to be a mother to G.B. For example, the Department caseworker set up no counseling for the mother and G.B. When crisis counseling for the mother was ordered by the court, only one session was provided. The caseworker would not discuss issues raised by the mother when she asked questions at supervised visitations. The caseworker rarely communicated with the mother-sometimes not even monthly and often only in court. The caseworker knew the mother did not have a phone but did not let her use her cell phone to set up important appointments. She never once met with the mother in her home and admitted she did not know if it was suitable. The mother testified credibly that while the boy was at Crestwood for one and one-half years, Crestwood only called her approximately three times. The mother had to contact Crestwood. The respondent mother was not even advised officially of her son's 2004 Crestwood Christmas concert. The caseworker did not notify the mother of family sessions she was supposed to have with G.B., and never got back to her even when asked about it, causing the mother to start calling two men at Crestwood who proved helpful when she wanted help and information. She apparently called them regularly, thus showing independent initiative. The caseworker admitted she did not help her with Temporary Assistance, and did not know why she was not getting it. Such help should have been provided. Because this mother, among other things, continued to see her children quite regularly and provide interaction with other relatives, acquired apparently stable housing, demonstrated ability to help care for at least one of her children (i.e., Tina) once she came to live across the street, inquired reasonably about G.B.'s progress in school, and planned for G.B. to live with his grandmother, the Department was not justified in doing little or nothing toward reunification. The testimony shows the caseworker was not even minimally active on the case.
NOW THEREFORE, for the reasons set forth above, it is
ORDERED that as and for a disposition in B 1951-04 regarding S.M., the petition is dismissed because the evidence did not establish that the best interests of the child require that [*15]the guardianship and custody of the child be committed to an authorized agency or to a foster parent authorized to originate this proceeding under section 392 of the Social Services Law or section 1052 of the Family Court Act; and it is further
ORDERED that transfer of S.M. from the foster parents to the great-aunt shall be completed as soon as possible; and it is further
ORDERED that if a notice of appeal is timely filed, the placement of S.M. with her great-aunt is stayed pending a decision on the appeal, and until the appeal is decided S.M. shall continue to reside with the foster parents, but shall spend workday hours with the petitioner, rather than in day care; and it is further
ORDERED that additionally, S.M. shall continue to spend alternate weekends from noon on Saturdays to 3 PM on Sundays, and two hours on the other Sundays, with Mrs. G. if an appeal from this order is timely filed; and it is further
ORDERED that as and for a disposition in B1949-04 regarding G.B., the petition is dismissed because the evidence did not establish that the best interests of the child require that the guardianship and custody of the child be committed to an authorized agency or to a foster parent authorized to originate this proceeding under section 392 of the Social Services Law or section 1052 of the Family Court Act; and it is further
ORDERED that transfer of G.B. by the Department to the grandmother Mrs. B. shall be made as soon as possible; and it is further
ORDERED that in the custody proceeding, Mrs. G. v Monroe County Department of Human and Health Services, Ms. J., and Mr. M., custody of S.M. is granted to petitioner Mrs. G.; and it is further
 ORDERED that the prior order in NN 7416-02 with regard to S.M. shall be terminated effective upon transfer of S.M. based on the custody order under Docket No. V06012-04; and it is further 
 ORDERED that in the custody proceeding, Mrs. B. vs. Monroe County Department of Human and Health Services, Mr. A., and Ms. J., custody of G.B. is hereby granted to petitioner Mrs. B., reserving to G.B.'s father his rights and subject to the neglect proceeding; and it is further
ORDERED that the extension shall be granted in NN 109-00 regarding G.B. for one year from the date hereof, and placement shall be modified to be with Mrs. B., a suitable person related to G.B. with whom he may reside, and the Department shall submit a separate order setting forth the terms of said extension, including the finding that a return to the home of his mother is not currently in his best interests and that placement with Mrs. B. is in his best interests, that the Department had not made reasonable efforts to return G.B. home, and that the new goal is permanent placement/custody/adoption by a suitable relative.
DATED: May 3, 2005
Rochester, NY______________________
MARILYN L. O'CONNOR
FAMILY COURT JUDGE
Footnotes

Footnote 1: The court heard five days of testimony on the issue of custody of S.M. When it became clear as a matter of law that custody was to be heard as part of the disposition phase of the termination case, the court took judicial notice of those custody proceedings without objection, and incorporated them into the disposition hearing on the terminations.

Footnote 2: A motion by the Department to dismiss this great-aunt's custody petition for lack of standing and failure to state a cause of action, among other reasons, was previously denied (Matter of Veronica G., 2004 NY Slip Op 50768U; 4 Misc 3d 1007A; 2004 NY Misc. LEXIS 1348). 

Footnote 3: The mother testified she did not see S.M. for a couple months in early 2003 because she was participating in "drug court" and was not allowed to see the baby unless she was clean and sober. At first she was not clean and sober. Once she got clean and sober, she resumed seeing S.M. regularly in the spring of 2003 and has been seeing her on Wednesdays ever since.

Footnote 4: She estimated she took in 4 or 5 children over a 10-year period, plus she did a lot of respite work for Hillside Children's Center.

Footnote 5: The county would no longer have to pay for day care, which currently is a cost in addition to the monthly stipend to the foster parents for taking care of S.M. In this particular case paid day care is provided by relatives of the foster family. 

Footnote 6: Also applicable here and to the same effect is Social Services Law (§ 384-b[3][e]), since the father was charged with abandonment.

Footnote 7: Exhibit 7 shows the "Welcome Home" celebration the day S.M. arrived, when she was only two days old.

Footnote 8: In Sibley, a grandmother with an established relationship with a grandchild was awarded visitation even after adoption by non-relatives who opposed visitation. The court recognized that "natural relatives may wish to perpetuate a sense of family".

Footnote 9: His removal might have been avoided had funds been available to repair the house. One can only suspect there was no program to fix the house-while foster care is a routine solution to inadequate shelter and children with problems.

Footnote 10: The Department could also help if it would find a way to provide her with a dryer. The grandmother testified she has a washer, but not a dryer.

Footnote 11: It was represented to the court that Mr. A., G.B.'s father, was incarcerated and in solitary confinement, and thus it is unlikely that he will in the near future either seek custody of G.B. or contest the granting of custody of G.B. to Mrs. B. Nonetheless, his rights in that custody case remain to be determined and are reserved.